UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>CHARLES HARVEY ECCLESTON,<br><br>            Defendant. | Crim. No. 15-54 (RDM) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Charles Harvey Eccleston's Motion to Modify Bond. Dkt. 10. Eccleston, who is currently detained, asks the Court to transfer him to the custody of the High Intensity Supervision Program administered in the Eastern District of Washington, in Yakima, Washington. *Id.* at 1. Eccleston explains that his brother James Eccleston, who lives in Seattle, is ill and that, if the Court were to transfer him to the Eastern District of Washington, he would be able to live with another brother, Kim Eccleston, and help run James's business when Kim travels to care for James. *Id.* at 2. The United States opposes the motion, arguing that Eccleston poses a danger to the public and a flight risk. Dkt. 12 at 1. The Court agrees and, accordingly, denies Eccleston's motion.

### I. BACKGROUND

Eccleston was indicted on April 23, 2015, and charged with attempting to access and cause damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A), (b), & (c)(4)(B); attempting to access a computer without authorization in order to obtain information in violation of 18 U.S.C. § 1030(a)(2)(B), (b), & (c)(2)(B)(i); attempting to access a computer

without authorization in order to defraud in violation of 18 U.S.C. § 1030(a)(4), (b), & (c)(3)(A); and committing wire fraud in violation of 18 U.S.C. § 1343. *See* Dkt. 6.

In opposing Eccleston's Motion to Modify Bond, the government relies principally on the Affidavit of FBI Special Agent Lauren Gulotta ("Gulotta Affidavit"), which was originally submitted in March 2015 in support of the Criminal Complaint and Arrest Warrant.[1] Dkt. 1. According to the Gulotta Affidavit, Eccleston is a scientist who previously worked for the Department of Energy ("DOE") and the Nuclear Regulatory Commission" ("NRC"). Dkt. 1-1 ¶ 15. On or about April 15, 2013, Eccleston entered the embassy of a foreign country in the Philippines and offered to sell purportedly classified e-mail addresses used for official correspondence between officials and employees of the "U.S. Energy Commission." *Id.* ¶ 14. When an FBI employee posing as an intelligence agent for the foreign country contacted Eccleston, Eccleston proceeded to develop an elaborate scheme to infect the e-mail accounts of dozens of DOE employees with a virus that would exfiltrate information from DOE servers and/or damage DOE computer systems. *Id.* ¶¶ 40–45. According to the government, on or about January 15, 2015, Eccleston sent as many as 80 e-mails that he believed contained a dangerous virus to DOE employees. *Id.* ¶ 118. He believed that he would be paid substantial amounts by the foreign country for his efforts. *Id.* ¶ 119. In addition, Eccleston met with an undercover FBI agent on several occasions and explained that he was motivated, at least in part, by his "frustration" and anger with the NRC. *Id.* ¶ 21, 40, 44.

Eccleston, in turn, has not submitted declarations or other evidence in support of his Motion to Modify Bond, but his motion contains representations of counsel regarding

---

[1] "The rules concerning the admissibility of evidence in criminal trials do not apply" in a hearing to determine whether a defendant should be detained pending trial. 18 U.S.C. § 3142(f); *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996) (per curiam).

Eccleston's desire to be released in order to assist his brothers James and Kim, both of whom currently reside in Washington State. Dkt. 10. Counsel represents that James is in "failing health" and that, if released, Eccleston could "help Kim run [James's] small used car business when Kim has to travel to care for their sick brother." *Id*. at 2. Counsel also represents that, if released, Eccleston could reside with Kim "at his residence in Yakima, Washington." *Id.* Finally, counsel reports that Eccleston has lived in Dallas, Texas and Richland, Washington for the majority of his life; that he lived briefly in Washington, D.C.; and that he moved to the Philippines in mid-2011, where his children still reside. *Id.* at 3. For present purposes, however, Eccleston has not otherwise contested the facts proffered by the government in opposing release.

Following his arrest in the in the Philippines on March 27, 2015, Eccleston was presented in the Central District of California on May 4, 2015. Dkt. 8. At the government's request, a magistrate judge entered an order requiring Eccleston's pretrial detention, finding him both a danger to the public and a risk of flight. Dkt. 7 at 18–21. Eccleston was then brought to the District of Columbia, where he waived his right to a detention hearing and was ordered detained without bond. He now seeks pre-trial release subject to various conditions. Dkt. 10.

## II.   DISCUSSION

### A. Legal Framework

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act of 1984 (the "Act"), 18 U.S.C. § 3142 *et seq.*, outlines the circumstances under which a defendant may be detained before trial. As relevant here, the Act directs the Court to order pretrial detention when it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and

the community." *Id.* § 3142(e)(1). It further directs the Court to consider four factors in determining whether a defendant poses a risk of flight or danger to the public:

>    (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ;
>
>    (2) the weight of the evidence against the person;
>
>    (3) the history and characteristics of the person, including—
>
>    >    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . .
>
>    (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* § 3142(g).

The government must demonstrate by "clear and convincing evidence" that no condition or combination of conditions other than detention would assure the safety of the community. *Id.* § 3142(f). It need only show by a preponderance of the evidence, however, that a defendant poses a risk of flight. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (per curiam). If the Court concludes that no conditions other than detention "will reasonably assure the appearance of the" defendant "and the safety of any other person and the community," the Court "shall order the detention of the" defendant "before trial." 18 U.S.C. § 3142(e).

**B. Eccleston's Motion**

Eccleston asks that the Court to transfer him to the custody of the High Intensity Supervision Program administered in the Eastern District of Washington. Dkt. 10 at 1. The United States opposes that request and argues that Eccleston is both a danger to the public and a

4

flight risk and that no degree of non-custodial supervision will eliminate the risks associated with his release. Dkt. 12 at 6–8. The Court agrees.

    1. *Danger to the Public*

The Court first addresses the government's contention that, if released pending trial, Eccleston would pose a danger to the public. Specifically, the government argues that the serious nature of the offenses Eccleston is charged with committing, the strength of the government's evidence against Eccleston, and the dangers potentially posed by Eccleston's release militate strongly against his transfer to a supervised release program. The government does not separately address Eccleston's history and character, although, as noted below, this factor overlaps in part with the factors the government does address. The Court considers each of the § 3142(g) factors in turn.

First, the "nature and circumstances of the offense[s]" with which Eccleston is charged are, by any measure, serious. The United States alleges that Eccleston, who previously held Secret and Top Secret security clearances, Dkt. 1-1 ¶ 15, offered to help a foreign country attack the electronic infrastructure of the United States, either by obtaining "engineering blueprints of modern U.S. nuclear plants," *id.* ¶ 14, or by damaging the DOE's computer systems, *id.* ¶ 42. Eccleston allegedly also told this foreign country that, if it "was not interested in obtaining . . . U.S. Government information," he would go to other foreign countries with the offer of information. *Id.* ¶ 14. Later, Eccleston allegedly told an undercover agent that he would provide the agent "with information concerning two highly-classified, unnamed U.S. Government programs in exchange for $100,000," *id.* ¶ 21, and that he could provide the agent with a list of e-mail addresses "he said belonged to NRC employees," which "could be used to insert a virus onto NRC computers, or to send a large quantity of emails . . . to shut down the NRC's servers,"

*id.* ¶¶ 23–24. He also sold the agent a list of approximately 1,200 NRC e-mail addresses, although the government acknowledges that these e-mail addresses were, in fact, publicly available. *Id.* ¶¶ 25–26. Still later, Eccleston engaged in extended, surreptitious communications with undercover FBI agents regarding how he might help the foreign country damage U.S. government computer systems. *Id.* ¶¶ 42–43. Eccleston further explained that he had left the NRC "in frustration" and was "mad at th[e] agency" and that he was no longer the "hardcore patriot" that he once was. *Id.* ¶ 44.

Although Eccleston may have oversold the sensitivity of the information that he offered to provide to the foreign country, the evidence currently before the Court suggests that he was serious about assisting a foreign country in engaging in cyberattacks and extracting sensitive information from the DOE and/or the NRC. Although not "crimes of violence" in the traditional sense, cyberattacks of this type can present a grave risk to the security of the United States and the safety of the public. The Court, accordingly, concludes that the "nature and circumstances of the offense charged" weigh in favor of continued detention.

The second factor—"the weight of the evidence against the" accused—also weighs in favor of continued detention. Although the Court recognizes that Eccleston has yet to proffer his defense, the government has presented a 122-paragraph affidavit detailing substantial evidence in support of its case. That evidence includes e-mails and other correspondence between Eccleston and undercover FBI agents. *See id.* ¶¶ 49–61. The government also represents that it possesses video and audio recordings of "each interaction between [Eccleston] and the persons whom he believed to be foreign intelligence agents." Dkt. 12 at 6. Among other things, these communications and recordings, many of which are transcribed in the Gulotta Affidavit, support the government's contentions that Eccleston proposed, developed, and executed a plan to send

what he believed to be a virus to dozens of DOE employees' e-mail addresses.  *See* Dkt. 1-1 ¶¶ 41–42, 45, 47, 49–51, 53–61, 96–98, 100–108, 111–13.

Third, Eccleston's "history and characteristics" do not tip the scales in either direction. Eccleston notes that has not previously been arrested or charged with any crime.  Nor is there any evidence that he has engaged in drug or alcohol abuse.  But the Gulotta Affidavit does support an inference, at least at this at this stage of the proceeding, that Eccleston was angry at the DOE and the NRC and that he was willing to act on this anger in a manner at odds with the safety of the community.  Because that evidence overlaps with evidence considered elsewhere, however, the Court does not give it independent weight in balancing the § 3142(g) factors.

Finally, the "danger . . . that would be posed" by Eccleston's release weighs in favor of continued detention.  According to the government, Eccleston committed the charged offenses from the Philippines using a computer and a variety of non-attributable e-mail accounts.  *See id.* ¶ 14.  If the government's allegations are true, the Court has no reason to believe that, upon transfer to the High Intensity Supervision Program, Eccleston could not—and would not—renew his alleged efforts to access and damage the government's electronic infrastructure.  *See id.* ¶ 44. This is not, in other words, a case in which supervised release might substantially mitigate the risks associated with a defendant's release from custody; it is a case in which supervision can do little to alleviate the risk that the defendant might access a computer or other electronic device and continue to engage in the alleged criminal behavior.

The Court, accordingly, finds that the government has met its burden of demonstrating by clear and convincing evidence that no condition or combination of conditions—including the High Intensity Supervision Program administered by the Eastern District of Washington—will reasonably assure the safety of the public.

2. *Flight Risk*

The Court also concludes that the government has shown by a preponderance of the evidence that Eccleston poses a risk of flight. As noted above, at least based on the limited record currently before the Court, the evidence against Eccleston is strong. If convicted, moreover, he could face up to ten years in prison. On top of this, he spent the four years prior to his arrest outside the United States in the Philippines, where his children still reside.

Eccleston also appears to lack close family ties in the United States. By his own admission, he has not lived near his siblings in at least seven years. Dkt. 10 at 3. Although his wife now lives in Pennsylvania, the government represents that she and Eccleston are separated, *see* Dkt. 12 at 6, and Eccleston has not suggested that her presence in the United States mitigates his risk of flight, particularly since his children remain in the Philippines. Nor is there any evidence that Eccleston has any long-term employment prospects or other significant financial ties to the United States. The fact that he proposes to help run his brother James's used car business while their brother Kim travels to help care for James does not create a significant financial connection to the United States.

In short, Eccleston lacks close ties to the United States or this jurisdiction; he is facing serious charges carrying a penalty of up to ten years in prison; he does not have significant financial ties to the United States; and his children reside outside the United States. The Court, therefore, finds that the government has met its burden of demonstrating by a preponderance of the evidence that no condition or combination of conditions—including the High Intensity Supervision Program administered by the Eastern District of Washington—will reasonably assure Eccleston's appearance before this Court.

### III.   CONCLUSION

For these reasons, the Court finds that no condition or combination of conditions will reasonably assure Eccleston's appearance and the safety of the public.  The motion seeking his transfer to the High Intensity Supervision Program in the Eastern District of Washington (Dkt. 10) is, accordingly, **DENIED**.

**SO ORDERED.**

>	/s/ Randolph D. Moss
>	RANDOLPH D. MOSS
>	United States District Judge

Date: October 27, 2015